# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| PRAVEEN K. KHURANA, | ) | Case No. 15-20205-TLM |
| | ) | |
| Debtor. | ) | Chapter 13 |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

## INTRODUCTION

Before the Court in this chapter 13 case is a motion for relief from the § 362(a) automatic stay brought by Genesis Financial Inc. ("Creditor") against Praveen Khurana ("Debtor").[1]  *See* Doc. No. 24 (the "Motion").  On July 7, 2015, a § 362(e) final hearing was held on the Motion, and the matter was taken under advisement.[2]

## BACKGROUND AND FACTS

The facts are drawn from the evidence presented at hearing.  The Court also takes judicial notice of its files and records in this case and Debtor's preceding

_____

[1]  Unless otherwise indicated, all chapter, section and other statutory references are to the Bankruptcy Code, Title 11, U.S.C. §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure 1001–9037.

[2]  This Decision constitutes the Court's findings of fact and conclusions of law on all pending matters.  Fed. R. Bankr. P. 7052, 9014.

MEMORANDUM OF DECISION - 1

cases.  *See* Fed. R. Evid. 201.  Debtor's sworn assertions in his schedules and

statements have evidentiary effect under Fed. R. Evid 801(d)(2).  *Jordan v.*

*Kroneberger (In re Jordan)*, 392 B.R. 428, 444 n.32 (Bankr. D. Idaho 2008); *In re*

*Vee Vinhnee*, 336 B.R. 437, 449 (9th Cir. BAP 2005).

### A.    2013 Case

Debtor filed a chapter 13 case on January 23, 2013.  Case No. 13-20058-

TLM (the "2013 Case").  Though initially Debtor filed *pro se*, counsel appeared in

early March 2013.  After amending schedules and statements, Debtor converted

the 2013 Case to a liquidation case under chapter 7 in May 2013.

Debtor's 2013 schedules disclosed he was the owner of real property at 858

Main St., Lewiston, Idaho (the "Property").  He characterized the Property as

"residence & business" and asserted the Property was worth $100,000.  Doc. No.

22 at 3.[3]  It is undisputed that the business on the Property was, and still is, a

restaurant.

While Debtor scheduled a debt of $85,000 owed to Creditor and secured by

the Property, *id.* at 8, an amended schedule, filed after the appearance of counsel,

increased the amount of Creditor's claim to $280,000.  Doc. No. 34 at 9.  Creditor

---

[3]  Debtor appeared to claim in the 2013 Case that he lived in an apartment above the
restaurant.  That situation changed.  In Debtor's most recent bankruptcy, he discloses a separate
parcel of residential property in Lewiston, Idaho, and at hearing testified the apartment above the
business could be rented out assuming a leaking roof were to be repaired.

MEMORANDUM OF DECISION - 2

objected to confirmation of Debtor's plan contending the debt was actually in excess of $508,000 and the Property was worth $120,000 not $100,000. Doc. No. 26. *See also* Claim No. 3-1 in the 2013 Case.

During the 2013 Case, Debtor entered into a reaffirmation agreement with Creditor. Ex. 206. Under that May 9, 2013 agreement, Debtor acknowledged a $508,416.25 prior obligation to Creditor as of the petition date secured by the Property, but the parties agreed to reaffirm a debt of $100,000—which the agreement represented was the Property's then-current fair market value—to be paid with interest at 3.75% over 120 months. The agreement was effective without Court order because no presumption of undue hardship was present and Debtor was represented by counsel in the course of negotiating the agreement and such counsel executed the requisite certifications. *See* § 524(c), (k), (m).

A no asset report was filed by the chapter 7 trustee in August 2013, Debtor's discharge was entered in September, and the 2013 Case was closed.[4]

### B.    2014 Case

Debtor filed another *pro se* petition commencing a chapter 13 case on

---

[4]  On June 15, 2015, Debtor filed a motion to reopen this case under § 350(b) on the ground that he failed to list an "overlooked" asset (a lawsuit). An objection to that motion was filed by counsel for interested parties Loyce Akers and Joshua Sutton, who argued that Debtor was trying to rectify his failure to disclose alleged claims against Akers and Sutton when filing his 2013 Case, and his failure to disclose an actual lawsuit he brought on those claims (Case No. 14-2-00160-2, Washington State Superior Court, Pend Oreille County) when filing a 2014 case. The objection to reopening was overruled, and the 2013 Case was reopened on June 26, 2015. Pursuant to Rule 5010, a trustee was appointed.

MEMORANDUM OF DECISION - 3

November 10, 2014.  Case No. 14-20952-TLM (the "2014 Case").  An attorney

appeared for Debtor a couple of weeks later.  However, in January 2015, the 2014

Case was dismissed on motion of the United States Trustee and closed.  Two

months later, a motion to reopen the 2014 Case was filed by Debtor alleging he

had intended to proceed with that case and the dismissal was due to his attorney's

failure to file documents.  That motion, and the Court's own order to show cause

directed to Debtor's counsel and related to the work counsel performed, were set

for hearing.  After that hearing on April 7, 2015, the order to show cause was

deemed satisfied and no action was taken against counsel.  The Court denied the

motion to reopen because—by then—Debtor had already filed another bankruptcy

case.

### C.      2015 Case

Debtor's *pro se* petition commencing Case No. 15-20205-TLM (the "2015

Case") was filed on March 23, 2015.

Debtor originally scheduled the Property as worth $27,481 with secured

claims that "exceed[] value."  Doc. No. 21 at 2 (sched. A).  Debtor's thought

process in arriving at that value is not clear.  More significantly, his opposition to

Creditor's Motion makes clear that he feels there is value in the Property in excess

of Creditor's present claim.  Indeed, on July 6, the day before the hearing, Debtor

filed an amended schedule A showing the fair market value of the Property as

MEMORANDUM OF DECISION - 4

$325,000 and the amount of the secured claim(s) against it as $110,421.  Doc. No. 48 at 1.

The creditor(s) with secured claims were not delineated on amended schedule A, and there was no amended scheduled D.  However, Debtor filed an amended chapter 13 plan the same day, and in it proposed to pay Creditor an "allowed secured claim" of $93,291.50 at 3.75% interest on a contract dated May 7, 2013.  Doc. No. 47 at 5, 7.  The amended plan also proposes to pay a $7,850 default to Creditor over the 60 months of the plan.  *Id.* at 6, 11.

While Creditor was listed on Debtor's master mailing matrix and shown on the statement of financial affairs as receiving payments within 90 days of bankruptcy and still owed either $93,457 (Doc. No. 21 at 29) or $7,750 (Doc. No. 21 at 30), it was not listed on schedules D–F.

The history of the lending relationship between Creditor and Debtor was established by exhibits, including the original note ($74,000 in July 2004) and serial modifications thereto, and a recorded deed of trust on the Property along with multiple recorded modifications.  Ex. 200, 201.  The last of the note modifications, dated June 1, 2013, reflects the adjustment of the then outstanding debt to a principal balance of $100,000, consistent with the reaffirmation agreement of May 2013 in the 2013 Case.

Debtor was in default in his payments on the modified note when he filed

MEMORANDUM OF DECISION - 5

the 2015 Case.  In fact, Debtor was facing an impending foreclosure on the deed

of trust securing Creditor's claim.  This was not a new situation.  The notices of

trustee's sale, Ex. 207, and the records of this Court, establish that the 2013 Case

was filed on January 23, 2013, two days before a scheduled trustee's sale; the

2014 Case was filed on November 10, 2014, four days before a scheduled sale;

and the 2015 Case was filed on March 23, 2015, four days before the most

recently scheduled sale.

### D.    The value of, and the equity in, the Property

#### 1.    Value

Debtor subpoenaed a real estate broker, Jan McCoy, who works in the

Lewiston, Idaho - Clarkston, Washington area.  She testified that Debtor had

contacted her for an appraisal or for a broker's price opinion ("BPO"), neither of

which she could or would provide.  She did indicate to Debtor that she regularly

did market analyses for purposes of establishing a listing price for a client's

anticipated sale of property.  Debtor then told her that he was interested in listing

the property and would like that analysis.[5]  Ms. McCoy performed the market

analysis and summarized the same on June 24, 2015.  *See* Ex. A.  Ms. McCoy

arrived at a proposed listing range of $264,667 to $275,000.  This estimate

---

[5]  The record, including the proposed plan, indicates Debtor had no intention of listing
the Property for sale, and misrepresented the situation in order to obtain Ms. McCoy's services.

MEMORANDUM OF DECISION - 6

includes the real estate with the first floor restaurant and second floor apartment,

and all of the restaurant equipment.  In regard to the last, Ms. McCoy relied solely

on a list of equipment provided by Debtor and did not verify the presence of or

inspect the equipment.  She also clarified at hearing that if Debtor suggested a

value for the equipment, she did not discuss it with him or confirm its value.  She

also agreed during cross-examination that the very presence of equipment could be

either a positive or negative factor in trying to sell the Property.

Ms. McCoy did not internally inspect the Property; she instead relied solely

on a "drive-by" on Main Street.  This, she indicated, was not unusual in making a

preliminary market analysis for listing purposes.  She used her general knowledge

of the market, her familiarity with downtown Lewiston properties in the vicinity of

the Property, county records,[6] and Multiple Listing Service ("MLS") data on

listings and sales to guide her analysis.  The MLS data indicated no actual sales

occurred within six months of the analysis, so she did not base her opinion on

comparable sales.  Instead, she used three active or pending listings and then

---

[6]  Neither party laid an adequate foundation for introduction of county tax assessments,
but Ms. McCoy mentioned in testimony that the amount of such assessment in 2014 was
approximately $124,000 and that this is information regularly gathered by her and other brokers
when doing market analyses.  She emphasized that while it is considered, it is neither "fair market
value" nor conclusive as to their opinions of value.  Creditor's valuation witness, Paul Tutcher,
stated that assessments could be as much as 20-30% higher or lower than fair market value, and
that he does not consider tax assessments when forming an opinion of such value.

MEMORANDUM OF DECISION - 7

"averaged" the data from those listings.[7]  She also noted that, in her review, she

discovered properties that had been on the market for extended periods, including

one for some 673 days and another on and off the market for several years.

While there has been some activity in the area surrounding the Property

over the past couple of years, she indicated there was not a large demand and not a

lot of interested, potential buyers, and marketing would take six months or more.

She also noted that, were she to list the Property, an internal inspection would

occur, and that could result in a "real change" in her opinion either up or down.

Paul Tutcher, another real estate broker, was called by Creditor and

testified regarding a BPO that he gave on the Property in 2013.  Ex. 204.  That

analysis resulted in an opinion of a $110,000 value as of April 2013.  According to

the testimony of Creditor's president, Mike Kirk, the presence of this BPO was a

substantial basis for the reaffirmation agreement in May 2013 that reduced the

balance of the obligation to $100,000.

Mr. Tutcher, like Ms. McCoy, only conducted a "drive-by" viewing of the

---

[7]  There are difficulties with this approach.  It appears from Ex. A that Ms. McCoy used a $249,000 listing that had been on the market for 57 days as a "low" figure and a $275,000 listing that had been on the market for 673 days as a "high" figure in her calculations.  These properties ranged from roughly 3,300 to 12,500 square feet in size.  The other listing was listed at $269,500 (a figure she also called a "median") and it was a roughly 3,500 square foot property that had been on the market for 345 days.  Neither the exhibit nor testimony clearly explained how the significant differences in listed price/square foot were adjusted or reconciled when considering a listing figure for the Property which this exhibit (as well as Ex. 204) indicates is 5,846 square feet.  Nor did the exhibit identify the condition, improvements, features or other relevant information about the listings she used.

MEMORANDUM OF DECISION - 8

Property.  He relied on three then-pending listings and three closed sales in reaching his 2013 conclusion of value.  He testified that he had been contacted by Creditor to do a 2015 "update" analysis but did not return that phone message because he was not interested in taking that engagement.  When asked whether the opinion he reached in 2013 would still be accurate in 2015, he said he would have no idea without doing a new analysis.

The evidence regarding value of the Property is thus widely varied, with significant issues presented by each broker's suggested approach.[8]  Mr. Tutcher's 2013 BPO adequately supported the decision of Creditor to reaffirm a $100,000 debt, but was inadequate for purposes of establishing value of the Property in 2015.  Ms. McCoy's market analysis, while performed in 2015, merely established an initial listing price range and she indicated more work—including physical inspection—would be needed to refine and arrive at a more accurate figure.  It was but a starting point, and one generated by Debtor's misleading indication he was interested in listing and selling the Property.

Moreover, the Court finds problematic Ms. McCoy's methodology of "averaging" other listing data.  That approach, and the lengthy duration of the listings on listed-but-unsold properties, impacts the weight the Court can give her ultimate conclusions.  While she did indicate there was some modest buyer

---

[8]  There was no evidentiary support at all for Debtor's scheduled $325,000 value.

MEMORANDUM OF DECISION - 9

interest in properties in the older section of downtown Lewiston, she did not tie the market interest to this specific Property or its immediate area. And the lack of any specifically identifiable activity impacts the general opinion suggested that prices are substantially higher now than in 2013.

Value is a factual determination, and the Court may consider and weigh any admissible evidence. *See*, *e.g.*, *Wilhelm v. Johnston*, 30 P.3d 300, 305 (Idaho Ct. App. 2001) (citing *Roemer v. Green Pastures Farms, Inc.*, 548 P.2d 857, 859 (1976); *Farber v. Howell*, 721 P.2d 731, 733 (Idaho Ct. App. 1986)). A trial court is not bound to accept one appraisal opinion completely, and may set the value at another figure based on the whole of the weighed evidence, including an intermediate figure. *Farber*, 721 P.2d at 733.

The Court finds that the value of the Property is $130,000. This ultimate finding considers and gives significant weight to the value of $110,000 under the 2013 BPO upon which both Debtor and Creditor relied in reaching the May 2013 reaffirmation agreement that provided for repayment of $100,000. It also considers and gives weight to the 2014 tax assessed value of approximately $124,000 but adjusts upward that 2014 valuation in light of Ms McCoy's testimony regarding some modest activity in the market and the presence of at

MEMORANDUM OF DECISION - 10

least a few outstanding listings.[9]  The Court, however, stops well short of embracing Ms. McCoy's ultimate conclusions and estimates given its concern over the methodology she used in "averaging" the listing prices of the unsold properties; the omission of price per square foot analysis and adjustment as applied to the square footage of the Property; the dearth of information about these three listed properties to address whether their improvements, features, condition, etc. were fairly relevant to the subject Property; the inclusion of restaurant equipment in her evaluation; the length of listings without activity; and the absence of any actually sold properties as comparables.[10]

### 2.    Secured claims and equity

The Court is not charged solely with determining value; it must also determine equity.  For stay relief purposes, equity exists if the value of the property exceeds all claims secured by that property, whether those claims belong to the moving creditor or others.  *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 447 (Bankr. D. Idaho 2008) (citing *Pistole v. Mellor (In re Mellor)*, 734 F.2d

---

[9]  The Court agrees with Ms. McCoy's view that the assessed value is a factor that may be considered (and consequently disagrees with Mr. Tutcher's view that it never be considered). *See generally* Idaho Code §§ 63-205, 63-205A, 63-207(1), 63-208(1) (requiring annual assessments at market value, and addressing the duties of assessors).  That said, assessments are not alone conclusive.  The amount of the adjustment here (about 5%) reflects the Court's weighing of the factors noted.

[10]  This should not be viewed as undue criticism of Ms. McCoy or Mr. Tutcher, who simply did what they were retained to do.  The underlying problem comes from Creditor and Debtor attempting to prove too much from these brokers' work.

MEMORANDUM OF DECISION - 11

1396, 1400 n.2 (9th Cir. 1984)). This requires identifying other claims secured by the Property.

### a.    Debtor's scheduling of claims

Debtor's original schedule D (secured creditors) lists Credit Bureau of Clarkston as holding two judgment liens totaling $17,130.47; the City of Lewiston as holding two "rehab liens" totaling $11,000; and Nez Perce County holding an "unknown" type of lien for $6,000. Doc. No. 21 at 12–13 (sched. D). These creditors' claims total $34,130.47.

### b.    Proofs of claim

While Debtor's schedules admit the foregoing liabilities, the Court has also reviewed the proofs of claim filed in this pending chapter 13 case.[11]

Claim Nos. 2-1, 3-1, 4-1 and 5-1 were filed by Nez Perce County for 2012 real property taxes of $3,032.16; 2014 real property taxes of $2,660.66; 2013 real property taxes of $2,890.96; and 2015 first quarter real property taxes of $590.96.[12] These taxes total $9,174.74.[13]

Claim No. 6-1 was filed by Creditor, asserting a secured claim of

---

[11]  None of the filed proofs of claim have been objected to and, thus, each constitutes prima facie evidence of the validity and amount of the asserted claim. *See* Rule 3001(f).

[12]  Each of these proofs of claim reference the specific parcel number for, and the assessed valuation of, the Property.

[13]  Under Idaho Code § 63-206(1), such taxes are a first and prior lien on real property.

MEMORANDUM OF DECISION - 12

$102,014.39 against the Property. Creditor's trustee's sale guarantee of June 22, 2015, Ex. 203 at 19–48 (the "TSG"), reflects Creditor's lien is in first position on the Property behind real property taxes.

Claim No. 1-1 was filed by the Idaho State Tax Commission ("ISTC") for unfiled individual income tax and sales and use taxes totaling $15,709.49. ISTC's proof of claim asserts only priority and nonpriority unsecured obligations, but also notes on the face of the filed claim that ISTC has a lien on Debtor's real and personal property by statute. While ISTC does not specifically assert a secured claim on its filed proof, the TSG does note the presence of recorded ISTC liens for sales and use taxes in 2008 (and continued in 2013), two more such sales and use tax liens in 2012, and another sales and use tax lien in 2014. The TSG also reflects an ISTC lien for individual income tax in 2014.

Claim No. 7-1 was filed by the State of Idaho Department of Health and Welfare as a priority unsecured claim for child support arrears in the amount of $122,403.99. The TSG reflects a 2006 lien of record filed by the State of Idaho for child support.

The TSG also reflects judgment liens of record for Credit Bureau of Lewiston Clarkston of $8,500.00 and $8,630.47 (collectively $17,130.47). No proofs of claim have been filed by the Credit Bureau though, as noted, Debtor's schedule D lists its secured claim of $17,130.47.

MEMORANDUM OF DECISION - 13

### c.    Calculation of equity

The Property has a value of $130,000 and the Court finds it is encumbered

by, at the least:

– real property taxes of $9,174.74;

– Creditor's first position secured claim of $102,014.39 at filing;

– the judgment liens of Credit Bureau of Lewiston Clarkston totaling

$17,130.47, plus interest accrued on those judgments from their respective dates

of entry in April 2006 and May 2007 to the date of the bankruptcy filing.[14]

The total of just these three encumbrances consumes all but $1,680.40 of

the Property's $130,000 value, and that is before consideration of Creditor's

§ 506(b) rights.[15]

Additionally, the TSG indicates the Property is also encumbered by the

ISTC's previously recorded liens aggregating $24,956.31 (sales and use tax) and

$12,822.37 (income tax), notwithstanding ISTC's failure as yet to specifically

---

[14]   In certain of his submissions Debtor argues that the Credit Bureau's "liens" were discharged in the 2013 Case under chapter 7.  The discharge, however, eliminates only collection of unsecured liability, and nothing in that case docket reflects any avoidance of the liens against the Property.  *See Johnson v. Home State Bank*, 501 U.S. 78, 82–84 (1991) (holding discharge in chapter 7 eliminated personal liability of debtor for the claim but that such creditor's right to foreclose on security survives or passes through the bankruptcy and constitutes a claim subject to inclusion in a later chapter 13).

[15]   The TSG indicates that the 2004 date of Creditor's recorded lien precedes the dates of recording of all other liens, and is junior only to real property taxes.  Creditor is thus oversecured and, under § 506(b), is allowed post-petition interest and reasonable attorneys' fees.  Those amounts were not discussed, estimated or established.

MEMORANDUM OF DECISION - 14

assert lien rights through a proof of claim.[16]

Thus, without addressing other possible encumbrances, it is clear there is no equity in the Property.

### E.    Debtor's plan

Debtor filed his amended plan, Doc. No. 47, the day before hearing. Debtor proposes to make monthly payments over 60 months. Debtor's proposed payment amount is exceedingly difficult to determine. There is no over all monthly payment to the trustee indicated in the plan. Some proposed payment amounts to certain creditors are on an "Exhibit A" attached to the plan, but that exhibit fails to address all creditors. In addition, Debtor claims to have made arrangements with certain other creditors (such as the child support enforcement authorities) to address payment of their claims but does not provide adequate detail regarding those arrangements.

Debtor claims his restaurant is profitable. But he provided no financial or accounting evidence to substantiate that assertion, nor to rebut the contrary implications from the significant claims filed for unpaid sales and use taxes, real estate taxes, and other business debts. Debtor's schedule I asserts gross monthly income of $4,000 and his schedule J includes both business and personal expenses

---

[16]  The claims bar date has not yet run. Nongovernmental creditors must file their claims by August 10, 2015 and governmental creditors must file their claims by September 21, 2015.

MEMORANDUM OF DECISION - 15

totaling $3,273.40 leaving net available monthly income of $726.60.  Doc. No. 21.
This amount appears facially inadequate to service the amount of outstanding
obligations established by the claims filed and by other evidence.  And, on this
record, such income has been insufficient to allow Debtor to pay, when due and in
full, his obligations to Creditor under the 2013 reaffirmation agreement, his real
property taxes, ongoing state sales and use taxes, and other obligations.

 These all must be paid under chapter 13 to the extent and in the manner
dictated by the Code.  The chapter 13 trustee filed a status report shortly before the
hearing.  Doc. No. 49.[17]  The trustee therein notes that the plan is not in a posture
to confirm.  In his view, there are significant issues regarding unfiled tax returns,
and the payment and treatment of Creditor's secured claim, and payment of the
priority claim of the Idaho Department of Heath and Welfare of $122,403.99
which must be paid in full under § 1322(a)(2) absent an agreement with that
creditor.[18]

**DISCUSSION AND DISPOSITION**

 **A.    Stay relief**

 Creditor's Motion contends relief from the automatic stay of § 362(a) is
proper, and expressly alleges relief under § 362(d)(2) and § 362(d)(4).  Creditor

---

 [17]  Trustee observed the hearing.  Neither Creditor nor Debtor called him to testify.

 [18]  As noted, Debtor alluded to some sort of agreement on his child support obligations,
but never established that one was reached or its terms.

MEMORANDUM OF DECISION - 16

also asserts that Debtor's case is a "single asset real estate case within the meaning

of § 362(d)(3)."  Doc. No. 24 at 2.

### 1.      Stay relief under § 362(d)(3)

Section 362(d)(3) provides special provisions for relief "with respect to a

stay of an act against single asset real estate . . . by a creditor whose claim is

secured by an interest in such real estate[.]"  The term of art "single asset real

estate" is defined by the Code: "The term 'single asset real estate' means real

property constituting a single property or project . . . which generates substantially

all of the gross income of a debtor who is not a family farmer *and on which no*

*substantial business is being conducted by a debtor other than the business of*

*operating the real property and activities incidental thereto*."  Section 101(51B)

(emphasis added).   The emphasized language has been construed to exclude real

property . . .

> if the debtor conducts a substantial business on the premises that is not
> merely incidental to the operation of the property.  For example, courts
> have held that the definition does not include a hotel, marina, golf and
> ski resort or a senior living center owned and operated by the debtor
> [on the debtor owned real property].  In contrast, if the debtor owns
> land leased to a tenant that operates a hotel, marina, golf course or
> skiing facilities, so that the debtor is only a landlord collecting rent
> from the tenant, the debtor's real property should fall within the
> definition because the debtor would not be conducting a substantial
> business on the premises.

2 Collier on Bankruptcy (Alan N. Resnick & Henry J. Sommer, eds, 16th ed)

¶ 101.51B.

MEMORANDUM OF DECISION - 17

The Bankruptcy Appellate Panel followed this approach, finding that a debtor's operation of a restaurant and bar in a hotel property it owned constituted substantial other business and excluded it from the definition of single asset real estate. *Centofante v. CBJ Dev., Inc. (In re CBJ Dev., Inc.)*, 202 B.R. 467, 472–73 (9th Cir. BAP 1996).

Debtor owns the Property, but does not merely lease it out. Instead, he conducts substantial business on it to generate his income. The restaurant is "not merely incidental to the operation of the property." The Court concludes this is not a single asset real estate case as that term is defined by the Code, and § 362(d)(3) is therefore inapplicable. Creditor's Motion on that ground will be denied.

### 2.    Stay relief under § 362(d)(4)

Creditor argues that stay relief is appropriate under § 362(d)(4). That provision of the Code states:

> (d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> . . .
>      (4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—
>      (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

MEMORANDUM OF DECISION - 18

(B) multiple bankruptcy filings affecting such real property.

*See* § 362(d)(4). If this provision's elements are met, then the final unnumbered paragraph of § 362(d)(4) provides the creditor with special relief. If a § 362(d)(4) order is recorded in compliance with state law governing interests in real property, such order is binding in any other case under the Code purporting to affect the subject property for a period of 2 years from the date of the order. In effect, it provides for *in rem* relief in any bankruptcy for that period of time.

Certain aspects of § 362(d)(4) are clear on this record. First, the stay at issue under § 362(a) applies to acts against the Property by Creditor who is secured by an interest in the Property. Second, § 362(d)(4)(A) is inapplicable since there was no transfer of ownership or an interest in the Property without Creditor's consent. Thus, the question revolves around multiple bankruptcy filings involving the Property under § 362(d)(4)(B).

There is no doubt that Debtor filed the 2013 Case, the 2014 Case, and the 2015 Case. But the Code requires more than just the occurrence of the multiple filings. It requires that "the filing of the petition was part of a scheme to delay, hinder, or defraud creditors."

Therefore, the critical question presented is whether the filing of the petition commencing the 2015 Case "was part of a scheme to delay, hinder, *or* defraud" creditors. *Id.* (emphasis added). The BAP has clarified that proof of fraud is not required:

MEMORANDUM OF DECISION - 19

> Section 362(d)(4) was amended by the Bankruptcy Technical
> Corrections Act of 2010, Pub.L. No. 111–327, 124 Stat. 3557 (2010)
> and became effective on December 22, 2010.  The conjunctive "and"
> in paragraph (4) was eliminated and replaced with the disjunctive "or."
> Therefore, after December 22, 2010, a party seeking relief from stay
> under § 362(d)(4) must show only a scheme by debtor to delay, hinder
> *or* defraud.

*Goldenberg v. Deutsche Bank National Trust Co. (In re Papazov)*, 2013 WL 2367802, *8 n.14 (9th Cir. BAP May 30, 2013); *see also First Yorkshire Holdings, Inc. v. Pacifica L 22, LLC (In re First Yorkshire Holdings, Inc.)*, 470 B.R. 864, 870 n.5 (9th Cir. BAP 2012).[19]

Several cases have addressed this Code provision, including *In re Hymes*, 2013 WL 653060 (Bankr. D. Alaska Feb. 20, 2013), *In re Tejal Investment, LLC*, 2012 WL 6186159 (Bankr. D. Utah Dec. 12, 2012), and *In re Briggs*, 2012 WL 3780542 (Bankr. N.D. Ill. Aug. 31, 2012).

Some cases note that "scheme" is not a term defined by the Code but is defined in dictionaries as "an artful plot or plan" or an "intentionally artful plot or plan," or simply "a plan or program of action," though some say "a plan or program of action, especially a secret or crafty one."  Attempting to resolve the

---

[19]  Even though § 362(d)(4) was added to the Code in 2005 and amended in 2010, Congress never amended § 362(g).  Thus, on the face of § 362(g)(2), debtors bear the burden of proof on all issues under § 362(d)(4) including the proof of an absence of an intent to hinder or delay.  Nevertheless, courts have required creditors to make out a prima facie case for relief under all sections of § 362(d) alleged regardless of the fact that creditors bear the ultimate burden of proof on only the question of a debtor's equity per § 362(g)(1), and debtors bear the ultimate burden of proof on all other issues per § 362(g)(2).  Here, the allocation of the burden is not the determining factor.

MEMORANDUM OF DECISION - 20

question solely through dictionary definitions is not ultimately workable. As

stated in *Briggs*: "[A] determination of whether or not a scheme exists will almost

always have to be one of extrapolation. No debtor is expected to admit to having

conducted a scheme. Rather, the court must attempt to deduce a scheme from the

facts." *Id.* at *5. And recall, it must be a scheme designed to "hinder" or "delay"

creditors. As noted in *Tejal Investment*, "delay" simply means "to postpone to a

later time" and "hinder" means "to get in the way of" or "to impede or delay the

progress of." *Id.* 2012 WL 6186159 at *5 n.12.

Under the case law, numerous factors may be relevant to a determination of

an intent to "hinder or delay." They include the number of bankruptcy filings;

their frequency; the time lapsed between filings; whether the filings were

dismissed, and for what reasons; whether the evidence suggests the debtor had a

legitimate belief that it could reorganize in such cases; the strategic timing of the

cases, especially in relation to creditor collection efforts such as foreclosure; any

changes in circumstances between the various cases; and others.

*Hymes* noted that the timing and circumstances of the several cases may

"constitute strong evidence of an intent to delay and hinder secured creditors from

collection." 2013 WL 653060 at *5. *Tejal Investment* similarly looked to the

timing of the filings, noting that the first petition was filed the day before the

creditor's action in state court to appoint a receiver was to be heard and the second

MEMORANDUM OF DECISION - 21

petition was days before a scheduled foreclosure sale, and "[t]ogether, these petitions evince a plan by the Debtors to delay or hinder the Bank's efforts to move forward with remedies provided by state law."  2012 WL 6186159 at *6.

Creditor maintains that each of the three filings (including the 2013 Case before it was converted from chapter 13 to chapter 7) was designed to thwart and stay the pending foreclosure sales, relying largely on the fact that each of the cases was filed within days of a scheduled trustee's sale.

Debtor argues that each case was filed so he could reorganize his financial affairs.  After the 2013 Case restructured the debt to Creditor to a far more manageable amount, Debtor claims the 2014 case was needed to "reorganize" his unexpected financial difficulties, but failed due to defects in his counsel's performance.  That attorney appeared at an earlier hearing before the Court and explained it was Debtor who refused to provide information, answer inquiries, and cooperate in advancing that chapter 13 case.  The Court, while not validating all aspects of counsel's conduct, found no reason to enter sanctions on the order to show cause and deemed that matter satisfied from the Court's point of view.[20]

In the process of addressing this order to show cause, counsel provided a

---

[20]  It suggested that if there were disputes remaining between Debtor and counsel over what was paid and for what work, they could take the matter to the Idaho State Bar for fee arbitration or grievance resolution but that it no longer implicated § 329(b) or required exercise of the Court's inherent authority.

MEMORANDUM OF DECISION - 22

declaration, *see* Doc. No. 41 in the 2014 Case, in which he asserted dismissal of the case seemed to him to be a foregone conclusion given Debtor's missed plan payments and the fact that Debtor had repeatedly failed to meet his promises to provide the documents and information necessary to complete the schedules, statements and plan. Counsel's declaration reflected that, in an email, Debtor stated "We plan to re-file immediately after the current dismissal. I will stop by your office this week to complete the needed schedules for the new filing as I will not be available next week for 1.5 weeks." *Id.* at 3. Counsel related that, after the January 6, 2015 dismissal of the 2014 Case, Debtor contacted him on January 8 and 20 about another filing. On January 23, counsel told Debtor he would not represent Debtor in a new case and to contact another attorney.[21] Yet Debtor did not file his 2015 Case until March 23, four days before the scheduled trustee's sale.

The Court finds the problems with the 2014 Case were not solely, or even primarily, those of counsel. And it is clear that, once this case was eventually dismissed, Debtor planned on immediately filing another.

Debtor of course denies the existence of any scheme to hinder or delay, and suggests he is exercising his rights under the Code in order to reorganize and pay

---

[21] This position was based on the repeated failures to provide documents and information, as well as to pay the rest of the agreed retainer fee.

MEMORANDUM OF DECISION - 23

Creditor along with his other creditors.[22]  And the Court has been sensitive to the fact that Debtor is in the present case trying to navigate the challenging course of proposing and confirming a chapter 13 plan without the assistance of counsel. That is most certainly ill-advised.  Almost all debtors who try to do so fail.  Even represented debtors have difficulties confirming plans, and difficulties in fully performing them if they manage to get them confirmed.  However, it is the overall course of conduct in the multiple bankruptcies that must be considered.

Debtor gained a significant benefit in the reaffirmation agreement in the 2013 Case which substantially reduced the principal debt to Creditor and provided favorable payment terms.  When that reaffirmed obligation was not performed, Creditor twice resorted to foreclosure only to encounter a bankruptcy filing on the eve of sale.  The totality of circumstances reflects a scheme designed to hinder and delay Creditor in its enforcement of its rights in the Property securing the reduced debt that was agreed to in 2013.  Relief is warranted under § 362(d)(4) and will be

---

[22] *Briggs* addressed that sort of contention:

The Debtor, of course, denies that a scheme exists, and invites the court to look at various indicia that the above-captioned case is filed in good faith.  This is, at its essence, an invitation to look closely at one tree and conclude that there is a tree, not a forest.  A scheme, on the other hand, is more precisely the forest than the tree. When looking at the totality of the circumstances—the forest, if you will—the court has no hesitation in finding that a scheme sufficient to meet the standards of section 362(d)(4) exists.

2012 WL 3780542 at *6.

MEMORANDUM OF DECISION - 24

granted.[23]

### 3.       Stay relief under § 362(d)(2)

Stay relief is proper under § 362(d)(2) if (A) there is no equity in the

property and (B) the property is not necessary for an effective reorganization.

On the evidence before it, the Court has found there is no equity as that

term is judicially defined.  While certain details or aspects of some of the multiple

liens against the Property are not entirely clear, there are sufficient secured claims

established on this record to consume the entirety of the $130,000 value found by

the Court.  Creditor's burden is met.

However, relief under § 362(d)(2) requires a finding not only of lack of

equity but also, under § 362(d)(2)(B), that the property is not necessary for an

effective reorganization.  This requires an evaluation of whether Debtor has

proven there is "a reasonable possibility of a successful reorganization within a

reasonable time."  *Jordan*, 392 B.R. at 450 (quoting *United Sav. Ass'n of Texas v.*

*Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988)).

---

[23]  Creditor asked the Court at hearing for a 2-year bar on Debtor filing another
bankruptcy, citing § 362(d)(4).  Creditor's characterization of that section is inapt.  Section
362(d)(4) does not bar a debtor from filing a case for 2 years.  (Such types of bars, if ordered,
generally arise when a case is dismissed and the Court imposes a § 349(a) bar on refiling.  No
such § 349(a) bar was requested here.)  Rather, § 362(d)(4) provides that, if appropriately
recorded, an order of stay relief concerning specific real property "shall be binding in any other
case under this title purporting to affect such real property filed not later than 2 years after the
date of the entry of such order by the court[.]"

MEMORANDUM OF DECISION - 25

Debtor claims a sincere desire to reorganize. But an ability to perform, as well as professed good intention, is required. Debtor failed to provide schedules, statements, and other required filings under § 521 in an appropriately detailed and comprehensive manner, and his plan is patently inadequate. Certainly the lack of an attorney is part of the reason. But the Court can only liberally construe what is filed, not forgive the absence of required documents or the violation of applicable rules and Code provisions.[24]

Additionally, Debtor's filings in the case and the evidence at hearing do not show that he has the financial ability to reorganize. The asserted income from the restaurant's operation is inadequate to fund payments of creditors' claims filed to date. The plan also does not provide for treatment of claims in a manner consistent with the Code's requirements. The chapter 13 trustee has noted these and multiple other issues and indicates the plan is not in a posture to confirm.

Whether these issues could be remedied and a plan confirmed within a reasonable period of time is doubtful. The history of the filings is a factor. So, too, is the lack of detail and other problems in Debtor's submissions. And the Court has also observed Debtor at hearings. While there appears to be no lack of

---

[24] *See Hyatt v. Hyatt (In re Hyatt)*, 2011 WL 6179267, at *4 (Bankr. D. Idaho Dec. 13, 2011) (noting the liberal construction provided to *pro se* filers); *Arnold v. Gill (In re Arnold)*, 252 B.R. 778, 781 n.2 (9th Cir. BAP 2000) ("*Pro se* appellants are accorded some leeway, but cannot ignore the Code and Rules, and the rules of this court.").

MEMORANDUM OF DECISION - 26

energy in Debtor waging his battle with Creditor, there is little skill and minimal understanding of the legal environment in which he finds himself.  That Debtor can correct all the deficiencies, fix all the problems, create a way to take his disclosed income and make it somehow stretch to pay all creditors to the extent required by the Code, even over a 60 month plan, are not things the Court can find plausible or likely given the totality of the circumstances.  Debtor failed to carry his burden under § 362(g)(2) to show a reasonable possibility of a successful reorganization within a reasonable time.  Stay relief will be granted under § 362(d)(2).

**CONCLUSION**

Upon the foregoing, the Court determines that the Motion is well taken, and stay relief will be granted under § 362(d)(2) and (4).  Creditor shall submit a proposed form of order.

DATED: July 21, 2015

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 27